SCHER ENTERPRISES, INC., f/k/a
Viviano Wine Importers, Inc.,
Plaintiff,

v.

BRONCO WINE COMPANY,
Defendant.

No. 00–CV–74824.

United States District Court,
E.D. Michigan,
Southern Division.

Dec. 11, 2001.

Timothy D. Wittlinger, Clark Hill, Detroit, MI, for Scher Enterprises, Inc.

John D. Pirich, Honigman, Miller, Lansing, MI, for Bronco Wine Co.

### MEMORANDUM AND ORDER DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

COHN, District Judge.

#### I. Introduction

This is a commercial dispute under the Michigan Liquor Control Code of 1998, P.A. No. 58, eff. April 14, 1998, M.C.L. § 436.1101, *et seq* (the Liquor Control Code), formerly the Michigan Liquor Control Act, M.C.L. § 436.1, *et seq.* Plaintiff Scher Enterprises, Inc. f/k/a Viviano Wine Importers, Inc. (Viviano) is suing defendant Bronco Wine Company (Bronco) over Bronco's refusal to consent to the transfer of a wine supplier agreement between Viviano and Bronco to J. Lewis Cooper Company (Cooper). Viviano and Cooper are wine wholesalers/distributors operating in Michigan; Bronco is a wine supplier based in California. Viviano claims that Bronco's actions violate § 436.1403(16) of the Liquor Control Code which prohibits a supplier from withholding its consent to a transfer of a wholesaler's business if the proposes transferee (Cooper) "meets the material and reasonable qualifications and standards required by the supplier." Viviano also claims that Bronco's failure to honor orders placed by Viviano prior to the sale, but not yet delivered as of the time Bronco learned of the impending transfer, violates §§ 436.1305(3) and 1305(7) which prohibit a supplier from withholding deliveries.[1] As a result of Bronco's refusal to consent to the transfer and allow Cooper to distribute Bronco's wine products, Viviano says it was forced to sell its business to Cooper at a greatly reduced price.[2]

Before the Court is Bronco's motion for summary judgment on the grounds that there is no genuine issue of material fact that Cooper failed to meet Bronco's material and reasonable qualifications and standards and Bronco properly refused to consent to the transfer. Viviano argues that there is a factual dispute on this issue. For the reasons which follow, the motion is DENIED.

#### II. Background

For a substantial period of time (not specified in the parties' papers), Viviano and Bronco had a wine supplier agreement providing that Bronco would sell certain brands of its wine to Viviano, including Forest Glen, Estrella, Silver Ridge, Fox Hollow, and Hacienda.

At some point, Viviano was interested in selling its wine distribution business. On July 26, 2000, Cooper signed a Letter of Intent addressed to Viviano reflecting their discussion regarding the terms of Cooper's purchase of Viviano's business. On September 29, 2000, Cooper and Viviano executed an asset purchase agreement, later amended dated October 5, 2000, with a closing scheduled from October 17, 2000. Section 4.1.15, entitled *Suppliers* provides:

> Schedule 4.1.15 sets forth the names and addresses of all suppliers of the Seller, the brands and brand names and quantities of each sold by each supplier to Seller, and the amount for which each supplier invoiced the Seller during the 36 month period ending June 30, 2000, and all purchase order, or commitments outstanding as of June 30, 2000, or

---

1. All of the sections Viviano claims have been violated are part of the Michigan Wine Distributors Act, M.C.L. § 436.1301, *et seq.*, which is Chapter 3 under the Liquor Control Act.

2. The record is unclear as to the difference in the price originally offered and the price actually paid.

which have accrued thereafter. Seller is no engaged in any disputes with any suppliers of the Business, and not supplier of the Business has informed the Seller that it intends to terminate or materially alter its relationship with the Seller and, to the best knowledge of Seller, no supplier is considering or has any basis for the termination, cancellation, non-renewal, or material alteration of its relationship with Seller. Since December 31, 1999, no supplier has termination or materially altered its relationship with Seller. To the best of Seller's knowledge, no supplier has otherwise threatened to take any action described in the preceding sentence as a result of a consummation of the transaction contemplated by the Agreement and the Collateral Agreements. Except as set forth in Schedule 4.1.15, Seller does not have any agreement or understanding with any supplier that restricts Seller's ability to sell the products of that supplier or any other supplier.

*See* Bronco's Ex. 7.

Schedule 4.1.15 has not been provided to the Court, but it is presumed that Schedule 4.1.15 lists Bronco as a supplier.

On October 12, 2000, Mark E. Scher (Scher), a Viviano representative, Jim Abdella, Operations Manager of Viviano, J. Lewis Cooper, III, President and CEO of Cooper, and Juilian Bryzinski, Sales Manager of Cooper, attended a meeting in California with Fred Franzia (Franzia), CFO of Bronco. At the meeting, Bronco was informed of the impending sale to Cooper. According to Viviano, Bronco did not express any concerns regarding Cooper.

Viviano says that on October 16, 2000, a letter (undated) was delivered to Bronco notifying them of the sale and requesting approval of the transfer of the distributorship to Cooper.

On October 25, 2000, Bronco wrote to Viviano stating that it would not approve of the transfer in part because had Viviano not provided sufficient notice to Bronco as required under the Liquor Control Code and because Cooper already distributes wine from Bronco's largest competitor (Gallo wine). The letter state in part:

[A]s a matter of national policy, we consciously avoid placement of our product lines in distributorships which carry the lines of our largest competitors. Additionally, we consider these requirements to constitute reasonable qualifications within the meaning of M.C.L. § 436.1305(1)(f) and have consistently enforced these requirements for many years. In our case, you have sold your business to a distributorship which already represents our single largest competitor. It is simply not in the best interests of our brands to play "second fiddle" to any product line where other alternatives are available.

Accordingly, given the lack of adequate notice and the competitive brand lineup of the purchaser of your business, we are unable to approve the transfer of our brands at this time. We will, however, continue to monitor the market closely, and if circumstances warrant, we may reconsider our position in the future.

Apparently, this letter was delivered while Franzia and another Bronco representative were in Detroit to discuss the sale. At that time, Viviano says it offered to have Cooper explain in greater detail how Cooper could market Bronco's products and meet Bronco's material and reasonable qualifications. Viviano says that Bronco refused to meet with Cooper.

On October 26, 2000, Cooper wrote to Bronco to express "extreme disappointment in our 30–second meeting today

where you disapproved the transfer" of Bronco brands to Cooper. Cooper then attempted to convince Bronco of its ability to distribute Bronco's wines and requested Bronco meet with them to discuss any concerns.

At some point, Bronco contracted with another supplier, L & L, as its replacement Michigan distributor.

Thereafter, Viviano says it had to sell its distribution business to Cooper at a reduced price of $1,650,000.00.

On November 2, 2000, Viviano filed its complaint, claiming violations of the Liquor Control Code, set forth above.

### III. Summary Judgment

Summary judgment may not be granted unless "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In determining whether summary judgment is appropriate, a court must resolve all ambiguities and draw all reasonable inferences against the moving party. *Employers Ins. of Wausau v. Petroleum Specialties, Inc.*, 69 F.3d 98, 101 (6th Cir.1995). The Court must decide "whether the evidence presents a sufficient disagreement to require submission to a fact finder or whether it is so one-sided that one party must prevail as a matter of law." *In re Dollar Corp.*, 25 F.3d 1320, 1323 (6th Cir.1994) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). Summary judgment is improper if there is any evidence in the record from any source from which a reasonable inference could be drawn in favor of the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574,

587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Nonetheless, "the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

### IV. Analysis

#### A. The statute

M.C.L. § 436.1305 provides in relevant part:

**436.1305. Structure for business relationship between wine wholesaler and supplier**

(1) The purpose of this section is to provide a structure for the business relations between a wholesaler of wine and a supplier of wine. Regulation in this area is considered necessary for the following reasons:

(a) To maintain stability and healthy competition in the wine industry in this state.

(b) To promote and maintain a sound, stable, and viable 3–tier distribution system of wine to the public.

(c) To recognize the marketing distinctions between beer and wine.

(d) To promote the public health, safety, and welfare.

(2) As used in this section, unless the context requires otherwise:

(a) "Agreement" means any agreement between a wholesaler and a supplier, whether oral or written, whereby a wholesaler is granted the right to offer and sell a brand or brands of wine sold by a supplier.

. . . .

(c) "Designated member" means the spouse, child, grandchild, parent, broth-

er, or sister of a deceased individual who owned an interest in a wholesaler, who is entitled to inherit the deceased individual's ownership interest in the wholesaler under the terms of the deceased individual's will, or who has otherwise been designated in writing by the deceased individual to succeed the deceased individual in the wholesaler's business, or is entitled to inherit such ownership interest under the laws of intestate succession of this state. With respect to an incapacitated individual owning an ownership interest in a wholesaler, the term means the person appointed by a court as the conservator of such individual's property. The term also includes the appointed and qualified personal representative and the testamentary trustee of a deceased individual owning an ownership interest in a wholesaler.

(d) "Good faith" means honesty in fact and the observance of reasonable commercial standards of fair dealing in the trade, as defined and interpreted under section 2103 of the uniform commercial code, 1962 PA 174, M.C.L. § 440.2103.

. . . .

(f) **"Reasonable qualifications" means the average standard of the criteria used by the respective supplier for wholesalers that entered into or renewed an agreement with the suppliers during a period of 24 months prior to the proposed transfer of the wholesaler's business.**

. . . .

(k) "Transfer of a wholesaler's business" means the voluntary sale, assignment, or other transfer of the business or control of the business of the wholesaler, including the sale or other transfer of stock or assets by merger, consolidation, or dissolution.

(3) **A supplier shall not do any of the following:**

. . . .

(g) **Withhold delivery of wine ordered by a wholesaler, or change a wholesaler's quota of a brand or brands if the withholding or change is not made in good faith.**

. . . .

(15) **A supplier shall not withhold consent to any transfer of a wholesaler's business if the proposed transferee meets the material and reasonable qualifications and standards required by the supplier. A wholesaler shall give the supplier written notice of intent to transfer the wholesaler's business. A supplier shall not unreasonably delay a response to a request for a proposed transfer of a wholesaler's business. However, a transfer of a wholesaler's business which is not approved by the supplier shall be null and void.** A supplier shall not interfere with, or prevent, the transfer of the wholesaler's business if the proposed transferee is a designated member.

(Emphasis added).

### B. The evidence

#### 1. Overview

The key issue here is whether Bronco complied with subsection (15) when it withheld its consent to the transfer of Viviano's wine distributorship business to Cooper. At the hearing on defendant's motion for summary judgment, the Court found that Bronco had given two apparently legitimate business reasons as to why Cooper does not meet its "material and reasonable qualifications" for distributors: (1) Cooper also distributes Gallo, a major competitor of Bronco and Bronco does not deal with distributors who also distribute the lines of its largest competitor, and (2) Cooper also distributes spirits, and Bronco does not

deal with distributors who distribute both wine and spirits. The Court then invited the parties to supplement their papers regarding these two business reasons and whether or not Cooper meets these requirements, which they did.

Although the record contains numerous affidavits and other documents, the inquiry is now focused on whether Bronco's stated business reasons are reasonable and whether Cooper satisfies these Bronco's business reasons. Each business reason is addressed in turn.

2. Bronco does not deal with distributors that also distribute their competitor's wines, especially Gallo, its largest competitor

### a. Viviano's evidence

Viviano submits the affidavits of Raymond J. Foresman (Foresman), an attorney who practices franchise law and current legal counsel for the Michigan Beer and Wine Wholesalers Association, the supplemental affidavit of Scher, and the affidavit of Seymour Leikind (Leikind),[3] a "beverage alcohol expert" specializing the distribution and marketing of beverage alcohol products.

In Foresman's opinion, Bronco's reasons for withholding its consent to the transfer to Cooper because Cooper also distributes Gallo wines is unreasonable because (1) the presence of a competitive brand does not relate to the performance of the distributor, and (2) L & L uses sub-distributors to distribute its products, some of whom also distribute Gallo wine and because sub-distributors are entitled to the same protections as other distributors, neither Bronco nor L & L could simply discharge those

sub-distributors that also do business with Gallo wine.

In his affidavit, Scher states that during discovery, it was revealed that Bronco has agreements with 28 distributors that also distribute Gallo wine and also learned from "personal contacts" of three other distributors for Bronco that also distribute Gallo wine, for a total of 31 distributors. Scher also says that he was unaware of Bronco's policy regarding not dealing with distributors that distribute Gallo wine until Bronco notified them of their refusal to consent to the transfer. Scher also states that L & L distributes five of the top ten premium wines that directly compete with Bronco's top selling wine.

Finally, Leikind states in his affidavit that Bronco's "desire to stay away from Gallo may be an expectation and desire that is unrealistic and unreasonable in the current marketing climate.... the universe of distributors is shrinking .... [Bronco's] insistence that ... being in a Gallo house is counter-productive is [sic] out of step with the market of today." Leikind also states that Bronco's refusal to deal with Cooper is "unwarranted and unjustified" because Cooper agreed to set up separate divisions for distributing Bronco and Gallo wine and have separate sales forces. Finally, Leikind says that "the strict criteria" for excluding any distributor who also distributes Gallo "is absolute folly" given "the dynamic acquisition currently the special driving force of the distributor system."

### b. Bronco's evidence

Bronco submits the second supplemental affidavit of Franzia and the affidavit of

---

**3.** Neither Forsman nor Leikind are listed as witnesses in this case and have not been deposed. As such, their opinions are not part of "the record" that the Court directed Viviano to search to find evidence indicating that Bronco wrongfully withheld its consent to the

transfer. To the extent that they shed any light on the issue before the Court, their opinions are set forth *infra*, however, the inquiry is focused not on these opinions, but the evidence pertaining to Bronco's stated business reasons for refusing to deal with Cooper.

Steven Lewis, the President and CEO of L & L. Franzia states that as of October 31, 2001, Bronco had a total of 413 national distributors. In explaining Viviano's evidence that Bronco dealt with distributors that also distributed Gallo wine, Franzia says that it purchased the Napa Ridge brand from Beringer and in doing so, "acquired" the distributors that Beringer used and Bronco therefore did not select any of these distributors. Franzia then goes on to list all of the identified 31 distributors and explain Bronco's relationship with each one. In some instances, Bronco "acquired" the distributors from Beringer, or from when a Bronco distributors merged with another distributor, or is a distributor in a market in which "Bronco" "has no other delivery option." Thus, Franzia does not deny that it deals with distributors in other markets that also distribute Gallo wine, but states that in the *Michigan* market, it had an alternative distributor option (L & L) that does not distribute Gallo wine. Also, of the 31 distributors, none of them are in the Michigan market. Franzia also notes that the 31 distributors represent only 7.5% of Bronco's 413 national distributors, "reflecting a 92.5% consistency in adhering to Bronco's requirements that it does not deal with distributors who also distribute its competitors. Finally, Franzia points out that Bronco terminated its distributorship agreements with 2 of the 28 distributors when they also became distributors of Gallo wine.

Bronco also submits the affidavit of Steven Lewis (Lewis), President and CEO of L & L, who states that he was aware that Bronco had a desire to "secure a *Michigan* distributor that was not a Gallo Wine distributor" and that prior to October 2000, L & L was a distributor for Bronco's Napa Ridge line of wines. He also states that although L & L does not distribute Gallo wines, it has a network of 19 out-state (outside of Southeastern Michigan) sub-distributors, called "jobbers" that distribute for L & L and of these 19 jobbers, 10 also distribute Gallo wines. However, Lewis says that Bronco does not have any agreements with these jobbers and that under Michigan law, L & L has the right to terminate them for "good cause" and also has the right to "dual" any jobber; that is, assign the same territory to another distributor. Finally, Lewis states that L & L's state wide network of jobbers was one of the features that influenced Bronco to select L & L as its replacement Michigan distributor for Bronco's wine products.

### 3. Bronco does not do business with distributors who also distribute spirits

#### a. Viviano's evidence

Scher says that Bronco has distributions agreements with 22 distributors outside of Michigan that also distribute spirits. He also states that Michigan is a "control state" with regard to the sale of spirits, meaning that the State of Michigan is the official wholesaler of spirits whereas in "open" states private businesses are licensed wholesales. The state controls the price, delivery charge and all other aspects of the spirits business but allows an Authorized Distribution Agent (ADA), which Cooper is, to warehouse, take delivery orders and collect payments made to the state from retail establishments. As such, the role of a distributor of spirits in Michigan is limited; the state owns all spirits until purchased by a retailer and so Bronco's concern regarding a distributor distribute both wine and spirits are unfounded. Scher further says that Cooper devotes a very small portion of its distribution business to spirits—less than 10% of its portfolio. Cooper also employs a separate sales force for spirits.

### b. Bronco's evidence

Franzia does not deny that Bronco has distributors that also distribute spirits, but again points out that many of these distributor were "acquired" when Bronco purchased the Napa Ridge Brand. Franzia also explains that for its New Hampshire business, New Hampshire law prohibits them from having a distributor that also does not distribute spirits. Franzia further states that spirit distribution in Michigan is concentrated among four ADAs, once of which is a consortium that includes Cooper and although Michigan has 100 wine distributors, only 6 of them, like Cooper, also distribute spirits. Thus, Franzia says that Cooper has significant leverage to dictate both the marketing of wines and spirits. In sum, Franzia says that Bronco "always selects the distributor for its products in a particular market that best satisfies its reasonable and material qualifications and standards."

### 4. In sum

The above evidence shows that Bronco's business reasons for not accepting a transfer to Cooper are problematic. First, while Bronco told Viviano that it has a "national policy" against dealing with a distributor that also distributes wine from its competitors, especially Gallo wine,

Bronco admits that a portion of its national distributors also distribute Gall wines. While Bronco explains why this is so, this fact creates a genuine issue as to whether Cooper meets Bronco's reasonable and material qualifications even though Cooper also distributes Gallo wine. This is particularly true because L & L, though sub-distributors, distributes Gallo wine, which Bronco knew. The same is true of Bronco's reason that is does not deal with distributors that also distribute spirits because apparently in some markets, Bronco does have distributors that also distribute spirits. Moreover, while Bronco is careful to explain that overall it selects the best distributor for the relevant market, the record evidence shows that there is a factual dispute as to whether Bronco acted reasonably in not agreeing to deal with Cooper and selected L & L in its place. Thus, because this case is before the Court on summary judgment, and not as a trier of fact, the motion must be denied.

### C. The case law

Moreover, as both parties acknowledge, there is very little case law regarding this subsection of the Liquor Control Code. In fact, there is no case law on point in this jurisdiction regarding this particular subsection.[4] Viviano cites to case law from

---

**4.** There is one case dealing with § 436.30b of the Beer Wholesales Act, now codified at § 436.1403(16), which is substantially similar to § 436.1305(15) of the Wine Wholesalers Act. Michigan has two virtually identical franchise laws, one for wine and one for beer, which are part of the overall Liquor Control Code. The only material difference between them is the exclusive territory provision unique to the beer industry. Suppliers of wine may grant the right to sell their brands in a particular territory to more than one wholesaler.

In *Monroe Beverage Co. v. Stroh Brewery Co.*, rev'd in part and remanded, 454 Mich. 41, 559 N.W.2d 297 (1997), the Michigan Court of Appeals held, inter alia, that

§ 436.30b was not void for vagueness, although the primary issue in the case was standing. The court of appeals explained:

Since "material" is not defined in the glossary, reference to a dictionary is appropriate. Black's Law Dictionary (4th ed., 1957) defines "material" as being "[i]mportant; more or less necessary; having influence or effect; going to the merits; having to do with matter, as distinguished from form." In the context of the statute, material qualifications are those which are important or necessary to the supplier. The language is not impermissibly vague. See *Allison v. Southfield*, 172 Mich.App. 592, 432 N.W.2d 369 (1988).

Stroh similarly argues that the term "reasonable qualifications" is unconstitutionally

other jurisdictions to support its argument that the issue of whether Bronco wrongfully withheld its consent is for a trier of fact.

Bronco cites in particular to a case from the Court of Appeals for the Seventh Circuit, *Sally Beauty Co. v. Nexxus Products Co.*, 801 F.2d 1001 (7th Cir.1986), where the defendant entered into a distributorship agreement with a supplier, that was subsequently acquired by plaintiff, also a supplier. Plaintiff, however, was owned by a competitor of defendant. The court of appeals found that, applying the Uniform Commercial Code, that the contract between the defendant and the supplier was not assignable to plaintiff. Despite defendant's arguments to the contrary, this case is not factually analogous or legally relevant.

Bronco also relies on a 1999 unpublished opinion by a private arbiter (Hon. George Bashara) in a dispute between Stroh Brewery and a distributor regarding Stroh's failure to allow a transfer of distribution rights to another distributor. In *Grabow Distributors, Inc. v. Stroh Brewery*, Grabow claimed that Stroh wrongfully refused to consent to a transfer of Grabow's distribution rights to another supplier, Vanderplow, upon the sale of Grabow to Vanderplow. Stroh argued that its decision not to consent to distribution to Vanderplow was based on a consolidation policy. The case was governed by M.C.L. § 436.1403(16) of Michigan Beer Wholesalers Act, which is substantially similar to § 436.1305 at issue here. *See* footnote 4, *supra.* The arbiter concluded that Stroh's qualification and standard to preserve its consolidation effort was not unreasonable and therefore found that Stroh did not violate § 436.1403.

Bronco's reliance on this case is misplaced. Simply because a supplier prevailed in an action brought by a distributer before a private arbiter, does not mean that this case is ripe for summary judgment. Indeed, even the arbiter noted that the case was close.

The Court's research revealed one case, albeit unpublished,[5] that sheds some light on the nature of the parties dispute. In *Viviano Wine Importers, Inc. v. Brown–Forman Corp.*, 89 F.3d 837, 1996 WL 389453 (6th Cir. July 10, 1996) (unpublished), the Court of Appeals for the Sixth Circuit affirmed the decision of the district court *following a bench trial* in favor of

---

vague, because the statutory definition refers to the "average standard of the criteria" used by the respective supplier. M.C.L. § 436.30b(2)(f); M.S.A. § 18.1001(2)(2)(f). We agree with the trial judge's analysis of this claim: [W]hile the word "average" has both a mathematical meaning, as in "median", "norm" and "mean" it also means "a level (as of intelligence) typical of a group, class, or series." Webster's Ninth New Collegiate Dictionary, (New York; Merriam–Webster Incorporated, 1983). "Standard" means, among other things, criterion. Given that a decision to accept a proposed transferee or to begin relations with a wholesaler must involve both objective economic determinations as well as subjective determinations such as perceived loyalty and commitment, the verbiage used in the Act is as specific as the subject matter requires.

In the context of the statute, the term "average standard" means the typical criteria used by the supplier in relation to its wholesalers. Stroh cannot establish that § 30b is void for vagueness. 211 Mich.App. 286, 295–96, 535 N.W.2d 253.

**5.** For the propriety and value of citing an unpublished decision, *see Anastasoff v. United States*, 223 F.3d 898, 899–905 (8th Cir.)(holding that unpublished opinions have precedential effect), *vacated as moot*, 235 F.3d 1054 (8th Cir.2000) (*en banc* ), *McGuinness v. Pepe*, 150 F.Supp.2d 227 (D.Mass.2001) (relying on unpublished opinions' persuasive authority), and Richard S. Arnold, *Unpublished Opinions: A Comment*, 1 J.App. Prac. & Process 219 (1999).

the defendant. The issue in the case was whether the defendant/supplier lawfully terminated a long-standing distribution agreement with the plaintiff. The issue turned on whether defendant violated § 436.30 of the Liquor Control Act, the predecessor of the Liquor Control Code, which provided, as it still does, that a supplier cannot terminate a distributorship contract unless acting in good faith and with good cause. The court of appeals stated:

> Michigan courts have considered questions of good faith, reasonableness, good cause, and notice as factual determinations to be made by the trier of fact. *Karibian v. Paletta,* 122 Mich. App. 353, 332 N.W.2d 484, 487 (1983) (notice and good faith are questions of fact); *Device Trading, Ltd. v. The Viking Corp.,* 105 Mich.App. 517, 307 N.W.2d 362, 366 (1981) (reasonableness is a question of fact). Federal courts have done the same. *Safeco Ins. Co. v. City of White House, Tenn.,* 36 F.3d 540, 548 (6th Cir.1994) (good faith is a question of fact); *Eastern Coal Corp. v. McNally Pittsburg Mfg. Corp.,* 274 F.2d 157, 158–59 (6th Cir.1960) (reasonableness is a question of fact).....

*After a full hearing on the merits, the district court found that [defendant] had complied with the letter of the Act, both as a matter of fact and as a matter of law,* in terminating its contractual relationship with Viviano. We have reviewed the extensive record in this case, and have given due consideration to the district court's rulings (both express and implied), the terms of the Act, the contractual agreements (and modifications) between the parties, as well as the parties' respective arguments on appeal. Viviano has done nothing to persuade us that any of its assignments of errors requires reversal of the district court's disposition of this case.

1996 WL 389453 at *1–2 (emphasis added).

### V. Conclusion

Here, as in *Viviano,* whether or not Cooper meets Bronco's material and reasonable requirements is a question of fact. Stated another way, there is a genuine issue of material fact as to whether Bronco acted unreasonably in withholding its consent to the transfer of distribution rights from Viviano to Cooper. Given this determination, the Court need not consider Viviano's argument that Bronco failed to seek summary judgment on its claim, weakly pled, regarding Bronco's failure to honor pending deliveries. In any event, Bronco did not seriously move for summary judgment on this claim, stating only in a cursory fashion in its reply brief that it had a right to stop deliveries to Viviano in light of the sale to Cooper.

SO ORDERED.